FILED
2026 Sep-18 AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **KIMBER LEIGH PARKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **7:23-cv-1656-EGL** |
| | ) | |
| **THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Kimber Leigh Parker worked as a police dispatcher for the University of Alabama Police Department for eight years. One of her tasks was to connect UA students who needed counseling with the UA Counseling Center. It is undisputed that her employment was terminated after she listened in on a phone call between a counselor and distraught student, interjecting, “What in the world!” in response to something the student shared. The head of the UA Counseling Center later told one of Parker’s superiors—Rusty Romine—that the counselor who had been on that call later received a call from Parker in which she apologized and said she “was interested in the call and decided to continue listening.” After Romine investigated Parker’s actions, he and Micah Rodgers decided to terminate Parker’s employment.

Two years after her termination, Parker sued her former employer, the Board of Trustees of the University of Alabama, and her former supervisors, Melissa Bailey and Calvin Kimbrow. Parker is disabled, and she asserts under the Americans with Disabilities Act and the Rehabilitation Act that Defendants (1) failed to provide reasonable accommodations for her disabilities, (2) subjected her to a disability-based hostile work environment, and (3) unlawfully terminated Parker based on her disability and as retaliation for protected conduct related to her disability. Defendants move for summary judgment on all of Parker's claims. Having considered the parties' briefs and evidentiary submissions, the Court finds that Defendants' Motion (Doc. 51) is due to be **GRANTED**.

Parker's failure-to-accommodate claims are barred by the two-year statute of limitations because any request for accommodation that was purportedly denied was denied more than two years before she filed suit.

Her hostile-work-environment claims fail for a similar reason. The only day within the statute of limitations was the day Parker was fired. While untimely discrete acts can be considered alongside timely acts as part of one hostile work environment claim, the timely acts must be sufficiently related to the claim. *See Chambless v. Louisiana-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007). Here, the timely act of terminating Parker's employment bears little relation to the acts of discriminatory intimidation, ridicule, and insult that make up her claims.

Finally, Parker's claims that her termination was discriminatory or in retaliation for her past complaints about discrimination fail as a matter of law. While Parker insists there is a dispute regarding whether she was listening to the counselor's call accidentally or purposely, that is the wrong question. The question here "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). Here, there is no evidence that the decisionmakers—Romine and Rodgers—engaged in discriminatory conduct toward Parker. And Parker has not created a dispute of fact over whether they believed that she had engaged in intentional and repeated misconduct by listening to calls between counselors and students. Parker's contention that the "proffered reasons for firing her were ill-founded" does not show "that unlawful discrimination was the true reason." *Id.* at 1267.

## BACKGROUND

Most of the relevant facts are undisputed and are set out below. Any disputes are noted by the Court and do not involve material facts.

Kimber Leigh Parker worked as a dispatcher for the University of Alabama Police Department from October 28, 2013, to December 6, 2021, and Melissa Bailey was her supervisor for most of Parker's employment. Doc. 53 at ¶¶1, 3. Communications Training Officers, including Calvin Kimbrow, functioned as shift

leaders when Bailey was not working. *Id.* at ¶3. As a dispatcher, Parker was responsible for answering, routing, and documenting non-emergency and emergency calls. *Id.* at ¶2. After transferring the calls, dispatchers would release the call by placing it on hold or hanging up on the dispatcher's end. If the receiving party asked for the call to be recorded, dispatchers could leave the line open to record the call, either taking off their headset or putting the phone down.

In November 2021, Parker was investigated based on a report from UA's Counseling Center that a dispatcher had listened in on a student-counselor call and exclaimed something while on the line. At the end of the investigation, Parker's employment was terminated. Two years later, she filed this suit alleging that UA and her supervisors created a hostile work environment, failed to accommodate her disability, and discriminated and retaliated against her based on her disability. *See* Doc. 1.

**A. Disability Accommodation Requests**

Parker suffers from disabilities including cerebral palsy and scoliosis, and over the course of her employment, she requested several accommodations at work. Doc. 53 at ¶¶9-10. In April 2017, Parker's request for a specialized work chair for her disability was approved, and she received the chair. *Id.* at ¶10.

Parker began a leave of absence in May 2019, and her next accommodation request was based on concerns she had about returning to work. *Id.* at ¶11. The Police

Communications Division had previously operated in Bryant-Denny Stadium, but around the time of Parker's leave of absence, Tuscaloosa County was building a 911 Center where it would eventually require all dispatchers to work. *Id.* at ¶¶12, 14. Parker was worried about navigating the workspace at Bryant-Denny upon her return, so she submitted a request for accommodation: She stated she would be using a walker, which would make it harder to navigate the smaller office and requested access to a handicapped restroom and parking space. Doc. 52-5 at 7-9. She explained there were "no handicapped parking or restrooms that [she] [had] found at the stadium," and the "parking space is something [she] would require in order to be able to continue to work at the stadium." *Id.* at 7. Based on her request, UA granted her a further leave of absence and stated it would continue to evaluate her other accommodation requests. *Id.* at 9. Due to Parker's concerns with the gravel parking and operating with the Bryant-Denny workspace, UA assigned her to work at the new 911 Center upon her return. Doc. 53 at ¶14. The space could not yet accommodate the entire Communications Department workforce but could accommodate a small subset. UA explained that the new facility "has handicapped parking spaces available, along with handicapped accessible restrooms." Doc. 52-5 at 10. Further, the "telephones [would] be on one handset in front of [her] workstation." *Id.*

In January 2020, Parker submitted a third accommodation form, asking for four months of medical leave and expressing concerns about the 911 Center: "There is not a bathroom close to the office. The closest bathroom requires going through heavy doors that are hard to open on a walker and even more difficult in the wheelchair. There are no automatic accessible exterior doors …. The handicapped parking spaces have ribbed areas in front of them and parking space markers that make it harder to get a wheelchair in/out of the space." *Id.* at 11-12.

UA granted Parker three months of leave and addressed each of her concerns. *Id.* at 29-30. It informed Parker that motorized interior and exterior doors would be installed by the end of April 2020 and that until then team members would assist her, and a handicap parking space large enough for wheelchair access would be added close to the loading dock. *Id.*; Doc. 53 at ¶¶18-19; Doc. 58 at ¶¶18-19 (Parker does not dispute that UA provided a new parking spot in response to her accommodation request).

In June 2020, in her fourth accommodation form, Parker requested an extension to her leave of absence and permission to work part time. Doc. 53 at ¶20. Her request was approved, *id.*, and in September 2020 UA granted a fifth accommodation request that limited her shifts to eight hours. *Id.* at ¶21.

Parker submitted her sixth accommodation request in March 2021, asking for (1) a wireless headset for the phone; (2) a wireless radio headset; (3) that her

computer monitors be lowered; (4) allowance to take walks intermittently throughout the day; and (5) that the filing system be moved off the floor. *Id.* at ¶22; Doc. 52-5 at 37. UA responded explaining (1) it would provide the earbuds; (2) the radio headset was unrelated to a disability as she already had a wireless radio headset; (3) her computer monitors could not go any lower; (4) she could take walks during her normal break time and could split up her lunch break into smaller periods for walking; and (5) she would not be required to file anything. *Id.* at 39; Doc. 53 at ¶25.

Parker claims she requested additional accommodations for her disability in her November 29, 2021 written rebuttal response as part of UA's investigation into her listening to the counseling call, Doc. 58 at ¶28, but review of her written rebuttal shows no request for accommodation, *see* Doc. 52-12 at 19-23. Her March 2021 request was therefore her last disability accommodation request. UA granted the majority of her requests in March 2021, and as to the others, it explained that it could not lower the computer screens and that her radio headset request was not related to her disability. Doc. 52-5 at 39.

**B. Work Environment Allegations**

Parker alleges that coworkers and her supervisors made comments she believed to be harassing based on her disabilities. She alleges coworkers referred to her as slow and commented on the way she would type and the amount of

information she would type. Doc. 53 at ¶¶29-30. She also testified that coworkers referred to her as a robot or computer and would refer to her accommodation letters in a negative fashion. *Id.* at ¶¶31-32.

Parker also alleges that her supervisors, Bailey and Kimbrow, engaged in this disability-based harassment. Bailey and Kimbrow allegedly made comments about how often she would use the restroom and would get onto her for not fully turning around when they talked to her. *Id.* at ¶¶34-35. Kimbrow and Bailey made comments about Parker's cane, special disability shoes, and made jokes about placing a flag on Parker's walker so that her coworkers would be able to see her if she fell. *Id.* at ¶¶41-44.

**C. Phone Call Incident and the Following Investigation**

On October 31, 2021, Parker transferred a student's call to the UA counseling center, and, instead of placing the call on hold as was the standard practice, she stayed on the line. Doc. 52-1 at 46-47. A few minutes into the call, Parker heard the word "kidnapping" and blurted out "What in the world?" *Id.*[1] After making the

[1] Parker consistently disputes Defendants' characterization of these acts, but does not dispute the underlying facts. Doc. 53 at ¶53; Doc. 58 at ¶53.

exclamation, Parker muted herself, and later called the counselor to apologize for remaining on the line. Doc. 52-12 at 19; Doc. 53 at ¶¶47, 49

UA was alerted of the incident when Assistant Chief Micah Rodgers received a call from the Executive Director of the UA Counseling Center, who informed Rodgers that a dispatcher transferred a call from a distraught student, said something during the call, and then called the counselor to apologize. Doc. 53 at ¶47.

Rodgers contacted Rusty Romine, Assistant Commander of Communications, and Kimbrow, and asked them to investigate the incident. Doc. 52-12 at 3. Romine reviewed the incident, spoke with Parker and the counselor, and informed Rodgers that Parker should have released the call. *Id.* at 2. Romine asked Kimbrow to investigate whether there were any similar incidents where dispatchers failed to properly release a call. *Id.* Kimbrow identified three other instances where Parker remained on the line listening to calls, and reported that when he spoke with Parker, she expressed her belief that all other dispatchers were listening in on calls as well. *Id.* at 4. Kimbrow investigated Parker's allegation but did not find evidence

supporting her claim. *Id.* Based on Kimbrow's report, Romine had Parker placed on administrative leave. *Id.* at 8.

Romine and Kimbrow investigated further and reported their findings to Rodgers.[2] Among the evidence Kimbrow uncovered was an email from Bailey sent September 2016 that stated: "Once a call is transferred to an outside party, our end of the call needs to be discontinued by placing the call on hold or released, unless otherwise specified by the receiving party (if they want the call to remain recorded)." *Id.* at 5.

Parker was informed of these findings and submitted a rebuttal. Doc. 53 at ¶¶62-63. Romine considered her rebuttal and updated his summary to reflect his findings, *id.* at ¶64, with the final report including the following:

> The recording [of the October 31 call] begins again at the time of transfer. The caller is very upset and speaking with a counselor when shortly after the 2-minute mark in the conversation you can hear PCO Parker say "What in the world!". The caller seemed to continue as if the counselor had been the one who spoke, and the call continued. I did not review the call further as I felt I had enough grounds for CTO Kimbrow to conduct a further investigation into the actions of one of his subordinates. I contacted CTO Kimbrow and instructed him to review the call and then review the past 3 months to see if this had

[2] Parker disputes several of Defendants' proposed facts because certain recordings referenced were not produced in discovery. *See, e.g.*, Doc. 58 at ¶50. But the Court is concerned only with "the employer's beliefs," *Alvarez*, 610 F.3d at 1266, not with their veracity. The admissibility of the underlying recordings is therefore immaterial. For the same reason, Parker's hearsay objections fail. What the counselor "supposedly told Dr. Vander Wal," Doc. 58 ¶49, is relevant not because it proves that what the counselor said was true, but because it shows that Romine and Rodgers fired Parker based on their beliefs about Parker's conduct rather than for an unlawful reason. *See* FED. R. EVID. 801(c)(2) (defining "Hearsay" as "a statement that … a party offers in evidence to prove the truth of the matter asserted in the statement").

> occurred before. It should be noted that PCO Parker uses a Bluetooth headset and can hear all conversation on an open line that is muted.
>
> …
>
> CTO Kimbrow reported to me that when he spoke with PCO Parker she indicated that she did listen to the call and thinks that other dispatchers listen in on the calls as well. CTO Kimbrow conducted additional research into the practices of the day watch dispatchers and found PCO Parkers claim to be false. During her initial PCO training at UAPD PCO Parker was instructed to release or place transfer calls on hold and not listen in on any conversation. This procedure is also explained in the current CTO manual. At no point has it ever been standard practice to place an open line on mute and listen to the call. This guidance was additionally received by all UAPD Communications Operators in email form on 09/02/2016.
>
> On 11/05/2021 I contacted Dr. Greg Vander Wal of the Counseling Center who relayed his concerns about the incident and a written report from the counselor who took the call and their concerns. It is the opinion of the counselor that this incident is a serious breach of student confidentiality.

Doc. 52-12 at 33-35.

Romine then explained that "during the course of this investigation, it was discovered that PC Parker listened in on confidential calls a total of 10 times" between August 22, 2021, and October 31, 2021. *Id.* at 17. Parker admitted to some of these instances but could not remember others. *Id.* at 19-23. Parker explained that she remained on the line to collect more information and perform her job well. *Id.* at 26. She also claimed to not be able to find the 2016 email instructing dispatchers to

release calls and to have been unaware of any policy banning open lines after transfer. *Id.* at 27.

Based on his investigation, and considering Parker's rebuttal, Romine wrote the following: "The investigation of [the October 31] incident has revealed that PCO Parker has a history of listening in on confidential conversations," and when asked about it by her supervisor, she "seemed to dismiss the inappropriate nature of her actions by claiming everyone else was doing it, a claim which has proven to be false." *Id.* at 35. Romine also wrote: "Parker is expected to gather information which is often sensitive in nature and respect the confidentiality of that information. If Parker cannot be trusted to follow core training and not eavesdrop on confidential calls her integrity is in question." *Id.* "[D]ue to the serious, deliberate, and egregious nature of this incident[,]" Romine recommended "termination of Parker[']s employment." *Id.* Rodgers agreed. Doc. 53 at ¶59. On December 6, 2021, Rodgers met with Parker and informed her of her termination. *Id.* at ¶67.

**STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute

as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In

reviewing the evidence submitted, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). In considering a motion for summary judgment, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**ANALYSIS**

Parker sues under § 504 of the Rehabilitation Act and Titles I, II, and V of the Americans with Disabilities Act. She claims Defendants failed to accommodate her disabilities, created a disability-based hostile work environment, and discriminated and retaliated against her because of her disabilities. Her failure-to-accommodate and hostile-work-environment claims are untimely and thus barred by the statute of limitations. Her discrimination and retaliation claims fail as a matter of law for the reasons explained below.

**I. Parker's Failure-to-Accommodate Claims are Time Barred.**

Parker's failure-to-accommodate claims are barred by the statute of limitations. Discrimination claims under Title II of the ADA and the Rehabilitation Act are subject to the same limitations period, which is "governed by the most analogous state statute of limitations." *Horsley v. Univ. of Ala.*, 564 F. App'x 1006,

1008 (11th Cir. 2014). "In Alabama, where this action was brought, the applicable limitations period is two years." *Id.*

An employer's failure to grant accommodations is a discrete act of discrimination, *see Abram v. Fulton Cnty. Gov't*, 598 F. App'x 672, 676 (11th Cir. 2015), and discrete retaliatory acts occur on the day they happen, meaning a party must file suit within two years "or lose the ability to recover for it," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110, 114 (2002) (For discrete acts of discrimination, "only incidents that took place within the timely filing period are actionable.").

Parker's last accommodation request was filed in March 2021; UA responded to this request on April 5, 2021, providing several of her requested accommodations and explaining why it was not granting her other requests. Doc. 52-5 at 37-39. Any alleged injury from UA's failure to accommodate thus occurred on April 5, 2021, and the limitations period for such a claim ran two years from that date, months before December 6, 2023, when Parker filed suit.

The only day within the limitations period is December 6, 2021, the date of her termination. Doc. 58 at 25. Parker does not dispute that her last accommodation request was filed in March 2021; she argues instead that UA's failure to accommodate was a continuing violation and "remained pervasive through her termination on December 6, 2021," and thus her failure to accommodate claim is

timely. *Id.* She is wrong. Even if Parker is correct that she was continually harmed by UA's failure to grant her accommodations requests in the way she wanted, "neither continuing effect nor continuing refusal to rectify are continuing violations." *Lewis v. Bd. of Trs. of Ala. State Univ.*, 874 F. Supp. 1299, 1303 (M.D. Ala. 1995). Any injury to Parker thus arose when UA responded to her requests, and the last response was on April 5, 2021. *Id.* at 39. Thus, her claims are time-barred.

## II. Parker's Hostile-Work-Environment Claims are Time Barred.

Parker's hostile-work-environment claims are subject to the same two-year limitations period and are time-barred as well, although the limitations period operates differently. "Hostile environment claims are different in kind from discrete acts." *Morgan*, 536 U.S. at 115. Because a hostile-work-environment claim is composed of a series of separate acts which collectively constitute an unlawful employment practice, if "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

Parker does not dispute that December 6, 2021, is the only day within the statute of limitations, and she does not claim she was subject to disability-based harassment on the day of her termination. She argues that the termination itself "is part and parcel of the hostile work environment: the decision was made with input from Kimbrow, who helped draft five versions of the termination memo, served as

HR liaison while misrepresenting the department's policies, gathered the alleged recordings, and had spent months mocking, humiliating, and harassing Ms. Parker." Doc. 58 at 26. If a discrete act such as termination is "sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim." *Chambless*, 481 F.3d at 1349-50.

Bur Parker's conclusory assertion that the termination was the "culmination" of the harassment, Doc. 58 at 26, does not make her termination the same type of conduct she complains of in her hostile-work-environment claims. "The circumstances surrounding [UA's termination] … do not suggest that [that] discrete act[] [was] the same type of 'discriminatory intimidation, ridicule, and insult' that characterized the untimely allegations." *Chambless*, 481 F.3d at 1350. Parker's hostile-work-environment claims are based on her co-workers and supervisors allegedly making fun of her disabilities. Parker has not alleged, or supported with record evidence, that she was subjected to any similar disability-based harassment on the day of her termination. *See Peddie v. InComm*, No. 1:17-cv-4405, 2019 WL 13548005, at *27 (N.D. Ga. May 21, 2019) ("[B]oth the timely and untimely acts must be acts of *harassment* contributing to a hostile work environment, not discrete employment actions such as termination."), *report and recommendation adopted*, 2019 WL 11075776 (N.D. Ga. Aug. 28, 2019), *aff'd*, 834 F. App'x 552 (11th Cir.

2020). Parker was investigated after she listened in on a private phone call between a counselor and student. Her employment was terminated based on this incident and an investigation that led Romine and Rodgers to believe that Parker had a pattern of listening in on phone calls. The only employment interaction Parker had on December 6, 2021, was Rodgers informing her that she was fired. Nothing in the record suggests that her termination involved the same type of disability-based harassment she claims to have suffered in the workplace. Thus, Parker's hostile-work-environment claim is untimely.

## III. Parker's Discrimination and Retaliation Claims Fail on the Merits.

Parker alleges UA discriminated against her because of her disability when it terminated her employment. Doc. 19 at ¶189. The ADA bars employers from "discriminat[ing] against a qualified individual on the basis of disability." *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1191 (11th Cir. 2024) (quoting 42 U.S.C. § 12112(a)). Similarly, the Rehabilitation Act prohibits federally funded programs from discriminating against qualified individuals with a disability, and the Court "analyze[s] claims brought under the ADA and Rehabilitation Act using the same legal framework." *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1214 (11th Cir. 2021).

A plaintiff can survive summary judgment on a discrimination claim through the *McDonnell Douglas* burden-shifting framework. *See Akridge*, 93 F.4th at 1191.

A plaintiff must first establish a prima facie case of discrimination by showing that (1) she has a disability; (2) she is qualified; and (3) the employer discriminated against her because of her disability. *Id.* The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision. *Id.* The burden "then shifts back to the employee to present sufficient evidence creating a genuine issue of material fact that the employer's reason is pretext for discrimination." *Id.*

Defendants do not dispute Parker's disabilities or her qualifications; only causation. *See* Doc. 53 at 26. To establish her prima facie case, Parker must show that she would not have been terminated "but for" her disability. *See Akridge*, 93 F.4th at 1192-94. And for her claim under the Rehabilitation Act, "[i]t is not enough for [Parker] to demonstrate that an adverse employment action was based partly on [her] disability;" she "must prove that [s]he suffered an adverse employment action solely by reason of [her] handicap." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (internal quotation marks omitted). Because UA has articulated a legitimate, non-discriminatory reason for Parker's termination, she must come forward with evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reason[]" for her termination. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000). Parker has failed to establish but-for causation or pretext.

First, Parker claims she has shown that "non-disabled comparators in her position - including one who made the same mistake - were treated more favorably." Doc. 58 at 34. Parker points first to Valerie Minor, referring to her as a "non-disabled comparator." *See generally id.*[3] "[A] plaintiff must show that she and her comparators are similarly situated in all material respects," and further, comparators "will have engaged in the same basic conduct (or misconduct) as the plaintiff." *Lewis v. City of Union City*, 918 F.3d 1213, 1224, 1227 (11th Cir. 2019) (internal quotation marks omitted). Parker has not established Minor as a proper comparator because she gives no details about Minor's employment history, disciplinary history, or other relevant details. And Parker presents no evidence that Minor engaged in "the same or substantially similar misconduct." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022).

Parker refers to another comparator "who made the same mistake" yet was not investigated or disciplined. Doc. 58 at 34. UA found only one other dispatcher who failed to release a call, but "[t]hat call was held open by the dispatcher for a total of 53 seconds, not the entire call." Doc. 53 at 12. Parker has otherwise not provided any evidence about the other dispatcher's employment history, experience,

[3] Parker relies on Minor as the comparator for her failure-to-accommodate claims, but since she specifically referred to "comparators" supporting causation and consistently refers to Minor as her "comparator," the Court has addressed why Minor is not a sufficient comparator for the discrimination claim.

title, or misconduct. Without such evidence, the Court cannot determine if Parker is "similarly situated in all material respects" to him or her. *See Jenkins*, 26 F.4th at 1249.

Nor has Parker shown that this other dispatcher engaged in the same or substantially similar misconduct. Parker does not dispute that this unnamed dispatcher left a call open for only 53 seconds, not the entire call, and much less time than Parker stayed on the line. Doc. 53 at ¶56. Parker's conduct was substantially different. She stayed on an open line between a counselor and student and exclaimed in reaction to their conversation. She then called the counselor to apologize, and the Counseling Center informed UA of Parker's breach of confidentiality. Additionally, Romine and Rodgers believed that Parker's misconduct was more pervasive. When UA investigated this incident, it discovered numerous other times Parker failed to release a call, suggesting that she had listened to many other confidential conversations. Parker does not produce evidence showing that UA thought other dispatchers had engaged in such conduct, so her unsupported reference to the other dispatcher fails to establish causation. And it similarly cannot support Parker's showing of pretext.

As explained above, Parker has not put forward evidence to allow a reasonable juror to infer that, but for her disability, she would not have been terminated. Even if she had, her claim fails because she does not rebut UA's proffered non-

discriminatory reason for her termination. UA terminated Parker's employment "based on the sustained findings of the internal affairs investigation which revealed a history of listening in on private and confidential conversations." *Id.* at ¶67. It pointed to this as the reason for Parker's termination when it fired her, *id.*, and in moving for summary judgment, *see id.* at 28-31.

"[A]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason," and in reviewing UA's proffered reason, the Court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions," and does not "analyze whether an employer's proffered reasons are prudent or fair." *Akridge*, 93 F.4th at 1195.

Parker argues that UA's stated reason for her termination is pretextual, but she provides nothing more than unsupported assertions. *See* Doc. 58 at 35-38. She has therefore not provided evidence that would allow a reasonable juror to conclude that UA was motivated by discriminatory intent because of her disability.

"[T]o establish pretext at the summary judgment stage, a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (en banc) (internal quotation

marks omitted). And if "the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." *Id.* The burden is on Parker to provide evidence showing both that UA's proffered reason was false and that disability discrimination was the real reason. *Id.* She has not done so.

In responding to UA's motion, Parker provides unsupported assertions attempting to establish pretext. First, Parker claims that the "dispute[]" as to the "adequacy of training" shows that UA's legitimate reason was false or that discriminatory animus was a motivating factor. Doc. 58 at 35. Parker's own testimony and arguments undercut this attempt to establish pretext. Parker consistently maintained that listening in on the call was an accident, she acknowledged the mistake, and does not dispute that she called the counselor afterward to apologize. Regardless of the "adequacy of training," Parker understood she was not supposed to listen in. And she does not point to any evidence suggesting that UA excused other dispatchers for the same conduct. Thus, even if subpar training suggests that firing Parker was not "prudent or fair," the Court's "sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). And Parker has not come "close to offering evidence even suggesting either that the Defendants' explanation for her termination warrants disbelief, which would permit but not compel a jury to find in Plaintiff's favor, or that some illegal, discriminatory

intent as opposed to purely personal or otherwise non-prohibited animus truly motivated the personnel involved in her termination." *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000).

Second, Parker claims that the "investigation was conducted by a conflicted supervisor" who had spent "months engaging in documented disability-based harassment," and that the "use of a biased supervisor as the primary investigator infects the entire process." Doc. 58 at 36. The Court need not consider whether Kimbrow is a "conflicted supervisor" who discriminated against Parker. The pretext inquiry considers only "the employer's belief … not on reality as it exists outside of the decision maker's head." *Todd*, 998 F.3d at 1218. All that matters are the beliefs of Romine and Rodgers. The Court is thus "unconcerned with the truth of the allegations that led to [Parker's] termination," *id.*, and an allegedly conflicted investigation does not provide evidence that Romine and Rodgers were motivated by discriminatory animus instead of a good faith belief that Parker breached the trust and confidentiality necessary for a police dispatcher. Arguing that Kimbrow was conflicted is not evidence that Rodgers "did not honestly believe" Parker had listened in on the October 31 phone call as well as multiple earlier calls. *Id.*

Parker then argues that "the 'cat's paw' theory of liability extends the discriminatory/retaliatory animus of Kimbrow to the ultimate decision-makers, Rodgers and Romine." Doc. 58 at 36. "A cat's-paw argument requires evidence that

the ultimate (and manipulated) decisionmaker—the puppet—'followed the biased recommendation' of another—the puppeteer—'without independently investigating the complaint against the employee.'" *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1301 (11th Cir. 2023) (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)); *see Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008) ("[A] non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct."). The record shows that Romine both directed the main investigation and conducted one of his own. There is no evidence showing that Romine merely rubber-stamped Kimbrow's investigation: he reviewed videos, spoke with Parker, and engaged in the entire process. "[B]eyond mere conclusions and unsupported factual allegations," Parker provides "no evidence of a failure to investigate." *Harris*, 82 F.4th at 1301 (internal quotation marks omitted).

Parker's final argument[4] is that the "disproportionality of the punishment supports an inference of pretext" because "[t]erminating a nationally recognized, eight-year employee with a clean record for an arguably accidental protocol violation - on the same day she submitted her final discrimination complaints -

[4] The Court already addressed Parker's fourth argument and her fifth is not supported by record evidence, nor does it tend to show discriminatory pretext. Even if there was a "predetermined outcome," Doc. 58 at 37, this is not evidence of disability discrimination.

supports a compelling inference of pretext." Doc. 58 at 37. As an initial matter, it's unclear what "final discrimination complaints" Parker refers to. Every mention in her brief of a report to HR in December is unsupported by any record evidence. *See, e.g.*, *id.* at ¶¶5, 69 (citing deposition testimony supporting earlier HR reports but citing no record evidence supporting a "final report[] to HR" in December). Further, there is no evidence supporting Parker's allegation that this punishment was disproportionate. She again points to an unnamed dispatcher as a comparator, but it is undisputed that this comparator listened to *one* call for 53 seconds, and not even the entire call. It is also undisputed that Parker blurted something out while listening in on the call, prompting the UA Counseling Center to contact Rodgers. And finally, the investigation into the incident revealed Parker's propensity for listening to these calls. As noted above, Rodgers and Romine were entitled to rely on their good-faith belief based on this investigation that Parker had engaged in this conduct numerous times and thus was unfit to be a dispatcher. There is therefore no support for Parker's assertion that her termination was "disproportionate[]" to her repeated breaches of confidentiality and trust. *Id.* at ¶103.

It is not the Court's role "to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez*, 610 F.3d at 1266. Parker has provided no evidence that would allow a reasonable juror to find that

Rodgers's and Romine's decision was made with a disability-based discriminatory motive.

Parker could still survive summary judgment if she produced a "wide range of circumstantial evidence," creating a "convincing mosaic," that would allow a jury to infer intentional disability discrimination by UA. *Ismael v. Roundtree*, 161 F.4th 752, 760 (11th Cir. 2025). Evidence establishing this mosaic may include, "among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins*, 26 F.4th at 1250 (internal quotation marks omitted).

While Parker is correct that she technically need not "squeeze her evidence into a single framework," show pretext, or identify a comparator, Doc. 58 at 34, her failure to do so is still relevant to the viability of her claims. The convincing mosaic inquiry is technically distinct from the *McDonnell Douglas* framework, but the questions asked within it are still relevant. *See Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023). And where, like here, a plaintiff fails to rebut a defendant's proffered non-discriminatory reasons for its actions, that failure tends to make the "mosaic" significantly less convincing. The circumstantial evidence Parker relies on must at least "directly create an inference of discrimination" for her to survive summary judgment. *Ismael*, 161 F.4th at 763. She still has the ultimate

burden to produce enough evidence to allow a reasonable jury to find intentional discrimination. *Tynes*, 88 F.4th at 946. And this she has not done. Whether the Court looks to the *McDonell Douglas* framework, the convincing mosaic standard, or only Federal Rule of Civil Procedure 56, the result is the same—there is simply not enough evidence in the record for a jury to find for Parker on the "ultimate question" of intentional discrimination. *Id.*

Parker's only remaining claims are for retaliation under the ADA and the Rehabilitation Act, which the Court will evaluate together. *See Todd*, 998 F.3d at 1214. To establish a prima facie case, Parker must show (1) she participated in conduct that the statute protects; (2) she suffered an adverse employment action; and (3) the protected conduct and the adverse employment action are causally related. *Id.* at 1219.

Parker has not established causation. She requested accommodations in April 2017, August 2019, January 2020, June 2020, September 2020, and March 2021. In responding to UA's statement of facts, she disputes that the March 2021 request was her last request for accommodation, alleging that she requested accommodations and complained of harassment in her November 29, 2021 rebuttal to the investigation of her misconduct. *See* Doc. 58 at ¶28. Parker's rebuttal challenged the investigation: she argued she did not receive adequate training, could not locate the email that advised dispatchers not to listen on calls, and that she made a mistake when she

remained on the call. Doc. 52-12 at 19-23. Parker claimed that she was "being overly scrutinized" and that she felt "unsupported by a department that claims to support its staff members." *Id.* at 22-23. Nothing in Parker's rebuttal complains about disability discrimination, and she has not shown why it would constitute protected activity. Further, Parker acknowledges that her "last accommodation request" was in March 2021, Doc. 58 at 25, expressly negating her dispute. Parker's conclusive assertion that she escalated discrimination complaints in October, November, and December 2021 is not supported by the record and does not establish protected activity.

She also relies on a verbal report made to HR: Parker allegedly recorded and reported a conversation where Romine told Parker not to go to HR, and that regardless of her rebuttal, UA would still recommend termination. *Id.* at ¶113. Even if Parker reported this threat to HR as she alleges, there is no indication that she engaged in activity protected by the ADA. Nothing in the alleged "threat" from Romine related to her disability, so any report to HR of that threat would not be a report of conduct made illegal under the ADA. *See* 42 U.S.C. § 12203(a). Parker's last established protected activity was in March 2021, and she was terminated in December 2021—nine months later.

A plaintiff can establish causation "by showing close temporal proximity between the statutorily protected activity and the adverse employment action," but

"mere temporal proximity, without more, must be very close"—a "three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (internal quotation marks omitted). Parker has not presented evidence of any protected activity after March 2021 and "in the absence of other evidence tending to show causation," this "substantial delay between the protected expression and the adverse action" is fatal to her retaliation claim. *Id.*; *see Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) ("[T]he three month period … does not allow a reasonable inference of a causal relation between the protected expression and the adverse action."). Further, an intervening act of misconduct breaks the causal connection. *See Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011). Parker does not dispute that she stayed on a confidential phone call and blurted out "What in the world!" for both counselor and distraught student to hear. She disagrees with the results of UA's investigation and contends she did not listen to all the listed phone calls, but her failure to properly release the call on October 31 is undisputed. This documented misconduct breaks any causal connection.

Parker has not established causation and thus has not produced evidence to allow a reasonable juror to infer that her termination was retaliation for her ADA protected activity.

## CONCLUSION

There is no genuine issue of material fact as to any of Parker's claims. Accordingly, Defendants' Motion for Summary Judgment (Doc. 51) is **GRANTED**. The Court will enter judgment by a separate order.

**DONE** and **ORDERED** this 18th day of September, 2026.

Edmund LaCour

**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE

.